**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CLAUDE G. LAJOIE,**

          **Plaintiff,**

-vs-                                            **Case No. 6:05-cv-252-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

          **Defendant.**

_____

**ORDER**

This cause came on for consideration without oral argument on the Complaint filed by Claude G. Lajoie, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security disability benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration (SSA). Doc. No. 5. This matter has been referred to me for disposition pursuant to 28 U.S.C. § 636(c).

**I.     PROCEDURAL HISTORY.**

On May 29, 2002, Lajoie filed an application for a period of disability and disability insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program (OASDI), 42 U.S.C. § 401, *et seq*., alleging a disability onset date of October 24, 2001. TR. 52-54. Lajoie's claim was denied, initially and upon reconsideration.

Lajoie requested a hearing before an administrative law judge (ALJ), which was held on March 4, 2004. TR. 252-78. Lajoie testified at the hearing. He was represented by Timothy Heffernan.[1] The ALJ also elicited the testimony of a vocational expert (VE). *Id*.

After considering the testimony and the medical evidence presented, the ALJ found that Lajoie had not engaged in substantial gainful activity since the alleged onset date of his disability. TR. 13. The ALJ concluded that the medical evidence indicated that Lajoie suffered from chronic obstructive pulmonary disease (COPD), fatigue, allergies, breathing problems, and a reading disorder. TR. 15. The ALJ determined that Lajoie's impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations. *Id*.

The ALJ found that Lajoie had the residual functional capacity (RFC) to perform medium work with environmental restrictions of avoiding concentrated exposure to fumes, odors, dust, gases and poor ventilation. TR. 17.[2] In reaching this determination, the ALJ accorded "little weight" to the opinion of Lajoie's treating physician, Anthony Kinsella, M.D., concluding that his opinion was "totally inconsistent and unsupported by the medical evidence . . . ." TR. 14-15. Specifically, the ALJ noted that certain portions of Dr. Kinsella's treatment records were difficult to read, that "there was no pulmonary function test report submitted with [his assessment]," and that "it did not appear that there were three satisfactory forced expiratory maneuvers performed . . .

---

[1] It is unclear from the record whether Mr. Heffernan is an attorney. Lajoie is represented by counsel in this appeal.

[2] Medium work is defined by the regulations as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). The regulations further provide that "[i]f someone can do medium work, we determine that he or she can also do sedentary and light work." *Id*.

." TR. 15; *see generally*, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E.  In addition, the ALJ found that Lajoie's allegations regarding his limitations were not totally credible.  TR. 17.

The ALJ determined that the Lajoie was unable to return to his past relevant work.  TR. 16. The ALJ noted that Lajoie's ability to perform all or substantially all of the requirements of medium work was impeded by "additional exertional and/or non-exertional limitations." *Id*. Consequently, the ALJ relied on the testimony of a VE to determine whether work existed in significant numbers in the national economy that Lajoie was able to perform given his RFC. Based on the testimony of the VE, the ALJ found that Lajoie was "capable of making a successful adjustment to work that exists in significant numbers in the national economy."  TR. 17. Specifically, the ALJ noted that Lajoie could perform the following jobs:  (1) sales attendant; (2) cashier; and (3) ticket taker.  TR. 18.  Hence, the ALJ determined that Lajoie was not disabled. TR. 16-18.

Lajoie requested review of the ALJ's decision by the Appeals Council.  TR. 7.  On December 30, 2004, the Appeals Council denied Lajoie's request for review.  TR. 4-6.  This appeal timely followed.  Doc. No. 1.

**II.    JURISDICTION.**

The ALJ's decision became the final decision of the SSA once the Appeals Council denied Lajoie's  request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981.  This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g).

### III. STATEMENT OF FACTS.

#### A. *Lajoie's Testimony*.

Lajoie was born on March 15, 1951. TR. 256-57. Lajoie finished school only through the sixth grade, after having repeated several grades, because he had to work to help his family. TR. 201, 257. Lajoie was unable to read a newspaper. TR. 270. He was a slow reader and had trouble understanding some of the words. He could read and understand a magazine if he had "plenty of time." *Id*.

Lajoie previously worked as a heavy equipment operator and long distance and dump truck driver. TR. 69, 258-60. Lajoie's most recent employment was as a heavy equipment operator with Atlantic Development, which lasted for about two and a half months. TR. 258. He was let go from that job in October 2001 for not performing his duties. TR. 69, 258. Specifically, Lajoie testified that he had to take a lot of breaks, use his inhaler, and that the heat in the summertime was too much for him to bear. TR. 265. Lajoie testified that not being able to work made him depressed. TR. 270.

Lajoie testified that he had trouble breathing and that he had arthritis in his neck and the lower part of his back. TR. 260. He stated that his back and neck locked-up "every so often." *Id*. Lajoie explained that on some occasions he could hardly move his head in the morning. Lajoie reported that this happened about three times a month. TR. 261. Lajoie underwent breathing treatments, sometimes as often as once a week, at Royal Oaks Medical Center/Group. TR. 261-63.

Lajoie also used a nebulizer[3] six times a day for about ten to fifteen minutes each treatment. TR. 264, 269. These treatments helped Lajoie with his breathing problems, but the medication only relieved his breathing problems for a couple of hours. TR. 269.

Lajoie testified that he was unable to sit for longer than thirty minutes at a time. TR. 266. He was unable to walk for more than two hundred feet without experiencing breathing problems. His daughter drove him to the hearing because the medication he was taking made him "emotional." TR. 267. Lajoie did not perform any household chores. He was able to take care of his personal hygiene needs. *Id*.

B.   *VE's Testimony*.

The ALJ posed several discrete hypothetical questions to the VE at Lajoie's hearing. The first hypothetical question consisted of the following:

> I'm going to assume I have an individual who is 53 years of age, has a 6th grade education, and has the past relevant work as described by the Claimant. That he could lift and carry less than . . . .
>
>     . . . .
>
> 10 pounds occasionally. That he could stand and/or walk for less than two hours in an eight-hour day. And . . . throw in some limitations for sitting. I have no idea if they're correct or not.
>
>     . . . .
>
> Let's say he could sit for six hours in an eight-hour day. And that he can only occasionally climb, stoop, bend, crouch or crawl. He has limited ability to reach in all directions including overhead to occasionally. And that he's to avoid

---

[3] "A device for administering a medication by spraying a fine mist into the nose. Also known as an atomizer." *See* MEDICINENET.COM, http://www.medterms.com/script/main/art.asp?articlekey=11737(last visited March 20, 2006).

> concentrated exposure to fumes, odors, dusts, gases, poor ventilation. Would such an individual be able to perform any of [Lajoie's] past relevant work or other work?

TR. 273. The VE responded that the hypothetical claimant could not perform Lajoie's past relevant work or any other jobs within Lajoie's transferable skill base. TR. 273-74.

The ALJ then posed another hypothetical question to the VE, which consisted of the following:

> Same hypothetical individual, same age, same past relevant work . . . can lift 50 pounds occasionally, 25 pounds frequently. Sit, stand or walk for six hours of an eight-hour day. Is to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation. Would he be able to perform any of [Lajoie's] past relevant work or other work?

TR. 274.

The VE responded that the hypothetical claimant could not perform Lajoie's past relevant work due to the limitations concerning exposure to fumes, odors, dust, gases, and poor ventilation. *Id*. The VE further responded that there were other jobs the hypothetical claimant could perform, taking out the issue of transferable skills. TR. 275. Specifically, the VE noted that the hypothetical individual could perform the following jobs, which he described as unskilled and light in physical demand: (1) sales attendant; (2) cashier; and (3) ticket taker. TR. 275-76.

Finally, the ALJ posed a third hypothetical question to the VE:

> If you have someone who could lift 10 pounds, could stand and walk for two hours, could sit for six hours – let me change the 10 pounds to 20 pounds. Still stand and walk for two hours, sit for six hours of an eight-hour day. Has the same limitations, he has to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation. With those limitations alone, would he be able to perform any of [Lajoie's] past relevant work or other work?

TR. 276-77.

The VE responded that the hypothetical claimant could not perform Lajoie's past relevant work or the jobs of sales attendant, cashier, and ticket taker. The VE remarked that such an individual would not be able to perform any jobs at the light duty level. TR. 277. The ALJ did not ask the VE whether there would be any jobs requiring a sedentary level of exertion that Lajoie could perform. TR. 277.

C.     *Medical Evidence.*

On April 6, 1996, Lajoie was treated at Parrish Medical Center. TR. 104-07. His chief complaints were chest pain on the left side, shortness of breath, difficulty breathing, and intractable cough. Lajoie reported that he smoked about one pack of cigarettes a day. His left lung had collapsed in 1976, and he had a benign cyst removed from his throat. TR. 104, 106. Ramesh N. Mathur, M.D., noted that Lajoie had been admitted with the diagnosis of pneumonia with acute exacerbation with chronic obstructive pulmonary disease. TR. 104. Juan J. Perez, M.D., observed on examination that Lajoie was wheezing and noted that Lajoie had a history of asthma. TR. 106. Dr. Perez's assessment was asthma, bronchospasm,[4] tracheobronchitis,[5] viral versus bacterial. TR. 106. Lajoie was treated with bronchodilators and steroids. *Id*.

---

[4] "Concentration of smooth muscle in the walls of the bronchi and bronchioles, causing narrowing of the lumen [the space in the interior of a tubular structure, such as an artery or the intestine]." STEDMAN'S MEDICAL DICTIONARY 245, 998 (26th ed. 1995) (hereinafter "STEDMAN'S").

[5] "Inflamation of the mucous membrane of the trachea [windpipe] and bronchi [the subdivisions of the trachea serving to coney air to and from the lungs]." STEDMAN'S at 245, 1829, 1962.

On June 11, 2001, Lajoie was treated by John G. Carey, M.D., for complaints of coughing, sore throat, sinus pain, fever, chills, and chest tightness/soreness. Dr. Carey's assessment was that Lajoie had bronchitis and sinusitis, among other things. TR. 95-96. On October 29, 2001, Lajoie presented to Dr. Carey with the same complaints. Dr. Carey's notes reflect that Lajoie was also experiencing breathing problems. The notes reflect that Lajoie was a smoker. TR. 91-93.

Lajoie was treated at Royal Oaks Medical Center/Group (Royal Oaks) on several occasions from December 2001 to February 2004. TR. 142-72, 174-79, 181-200, 208-16, 237-46. The physicians affiliated with Royal Oaks include Anthony Kinsella, M.D., John Flaherty, M.D., Ronald E. Breininger, Jr., M.D., and Rodolfo A. Torres, Jr., M.D. TR. 148. The records reflect that all of these physicians treated Lajoie at one time or another.

During his treatment at Royal Oaks, Lajoie consistently complained of chest pain, chest congestion, shortness of breath, asthma, ear pain, and fatigue. TR. 144, 155, 165, 176, 184, 188, 195, 197-99. Diagnoses include COPD and asthma by Dr. Kinsella and others. *E.g.,* TR. 195, 197-99 (Dr. Kinsella). The record contains several undated pulmonary function tests. One showed a forced vital capacity (FVC) of 55% of predicted values. The diagnosis by a treating professional whose name is illegible was moderate to severe COPD with probable air trapping. TR. 178. Another showed an FVC of 75% of predicted values. TR. 158. A third test result showed an FVC of 79% of predicted values.[6] TR. 217. A fourth test, apparently taken in 2004,[7] included both

---

[6] Dr. Kinsella noted this test result in a treatment record dated September 26, 2003. TR. 211.

[7] A Royal Oak treatment record dated February 14, 2004, reflects the result of this test. TR. 240.

"pre" and "post" bronchodilator readings. The result of the "pre" bronchodilator test was an FVC of 40% of predicted values. TR. 242. The result of the "post" bronchodilator test result was an FVC of 45% of predicted values. TR. 243.

Lajoie was treated by Frank T. Dienst, M.D., from January 2002 to March 2002. TR. 108-10. In January 2002, Dr. Dienst wrote that Lajoie became breathless after walking one-half block and less than one flight of stairs. He had an intermittent cough and continued to smoke. TR. 110. In February, Dr. Dienst indicated that recent pulmonary function tests (PFT's) revealed significant obstructive lung disease. TR. 109. He treated Lajoie with a variety of medications. TR. 109. In March 2002, Dr. Dienst counseled Lajoie that he must stop smoking. TR 108.

On June 3, 2002, Lajoie was treated at Royal Oaks for sharp pain in his lungs, burning sensation, ear problems, fatigue, and lightheadedness. The attending physician, Ronald Breininger Jr., M.D., diagnosed him with, among other things, otitis externa,[8] allergic rhinitis,[9] and COPD. TR. 195.

In September 2002, Lajoie underwent spirometric pulmonary function testing at the request of the SSA.[10] TR. 114-23. A series of three tests were administered. On the first test, Lajoie's

---

[8] "Inflammation of the external auditory canal." STEDMAN'S at 1272.

[9] Inflammation of the nasal mucous membrane, associated with hay fever. STEDMAN'S at 1544.

[10] Spirometry measures the mechanical function of the lung, chest wall, and respiratory muscles by assessing the total volume of air exhaled from a full lung to an empty lung (residual volume). Spirometry is used to establish baseline lung function, evaluate dyspnea, detect pulmonary disease, monitor effects of therapies used to treat respiratory disease, evaluate respiratory impairment, evaluate operative risk, and perform surveillance for occupational-related lung disease. *See* Raed A. Dweik, *Pulmonary Function Testing*, EMEDICINE,

forced vital capacity (FVC) was 86% of the predicted value. On the second test, his FVC was 80% of the predicted value. By the third test, his FVC was 65% of the predicted value. R. 117-19. The physician or other treating professional who administered this test did not provide an assessment of the test results.

On September 10, 2002, Nitin Haté, M.D., examined Lajoie at the request of the SSA. TR. 111-13. Lajoie complained of low back pain that radiated into his left leg, left leg paresthesia[11] and allergies. TR. 111. Lajoie reported that until recently he had been smoking one pack of cigarettes per day but that he was then only smoking two cigarettes per day. Dr. Haté observed that Lajoie's muscle and grip strength were normal and that he had full range of motion (ROM) in all joints. TR. 112. Straight leg raising was negative bilaterally.[12] Dr. Haté further observed that Lajoie's cardiovascular and respiratory systems exhibited no abnormalities. He noted that pulmonary function tests were performed that day, but it appears that Dr. Haté did not have the results of these tests when he examined Lajoie. *Id*. Dr. Haté opined that "the physical examination [was] within normal limits." TR. 113.

---

http://www.emedicine.com/med/topic2972.htm (last visited March 20, 2006).

[11] "An abnormal sensation, such as of burning, pricking, tickling, or tingling." STEDMAN'S at 1300.

[12] "'The simple straight-leg raising test [SLR] is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'" *Menezes v. Apfel*, No. CIV. 99-168-B, 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

On October 16, 2002, Lajoie was treated at Royal Oaks for night sweats and breathing problems. TR. 187. The attending physician noted that Lajoie's breathing had worsened. *Id*.

On January 16, 2003, Lajoie was examined by Dr. Torres. TR. 181. Dr. Torres noted that Lajoie had decreased ROM in his neck secondary to pain. He also noted that Lajoie was tearful towards the end of the examination. Dr. Torres assessed Lajoie with chronic neck pain, depression, COPD, hyperlipidemia, and allergic rhinitis. TR. 181. Dr. Torres prescribed Paxil for depression. TR. 177, 182.

Later in January 2003, Lajoie told Dr. Torres that Paxil was causing headaches and increased nasal congestion. He also reported that he was having financial difficulties resulting in poor compliance with taking his medication. TR. 177; *see also* TR. 167.

In April 2003, Lajoie attended a six-day vocational assessment program. TR. 140-41. On April 25, 2003, Timothy E. Seaman, CVE,[13] submitted a report in which he opined that Lajoie was not capable of successfully completing a vocational program or working competitively at that time due to very limited work tolerance. TR. 141. Seaman observed that Lajoie displayed very little stamina and pain tolerance for performing light, repetitious work. Seaman noted that the longest Lajoie was able to work during the assessment was two hours. Seaman observed that Lajoie appeared to be very depressed. *Id*.

In June 2003, a treatment note from Royal Oak indicated that Lajoie was doing well in cutting down his cigarette smoking with the use of Wellbutrin. TR. 168.

---

[13] Certified Vocational Evaluator.

On July 28, 2003, John W. Flaherty, M.D., noted that Lajoie's last pulmonary function test revealed restrictive and obstructive patterns.  During this examination, Lajoie complained of shortness of breath, wheezing, coughing, aches, malaise, fever and fatigue.  Dr. Flaherty's assessment was moderately severe COPD.  TR. 142.

On September 2, 2003, Lajoie was treated by Dr. Kinsella for complaints of breathing and coughing problems.  TR. 153.  He was diagnosed with severe acute bronchitis.  *Id*.

On September 15, 2003, Lajoie was examined by Dr. Flaherty.  TR. 212-13.  Lajoie reported that he had just finished a course of antibiotics but still had "some cough and some phlegm."  Dr. Flaherty noted that Lajoie was suffering "from a lot of back pain[,] muscular skeletal aches and pains[,] and in particular was diagnosed with a 10% to 15% disability due to some chronic low back pain."  TR. 212.  Dr. Flaherty opined that Lajoie had "a mixed bag of COPD and asthma and that . . . he need[ed] a good pulmonology work-up."  TR. 213.

On September 22, 2003, Jeffrey M. Williamson, Ph.D., examined Lajoie and prepared a psychological evaluation at the request of the SSA.  TR. 201-04.[14]  Lajoie reported that he was suffering from depression and that his appetite was poor.  Lajoie also reported that he had trouble sleeping at night.  TR. 202.  Lajoie used an inhaler and nebulizer to aid his breathing during the course of the evaluation.  *Id*.

Dr. Williamson observed that during the course of intelligence testing and personality inventory, Lajoie expressed difficulty with anything that required him to read what he considered

---

[14] Thomas J. Hagan, a licensed mental health counselor, also signed the evaluation.  TR. 204.

difficult words and passages. TR. 202-03. Dr. Williamson opined that Lajoie demonstrated a definite reading disability, signs of insecurity, inadequacy and sense of inferiority, low self-esteem, and signs of dependancy, especially in problem solving situations. TR. 203. Dr. Williamson administered a Wechsler Intelligence Scale-Third Edition test (WAIS-III), the standard instrument in the United States for assessing intellectual functioning. Lajoie obtained a Full Scale IQ of 83, which placed him in the thirteenth percentile. *Id*. Lajoie obtained a Verbal Comprehension Index of 80, which placed him in the ninth percentile, and a Perceptual Organizational Index of 93, which placed him in the thirty-second percentile.

Dr. Williamson diagnosed Lajoie with dysthymic disorder[15] and a reading disorder. He opined that Lajoie might benefit from outpatient psychotherapy to assist him in dealing with his depression and working with the Adult Literacy League to increase his reading ability. TR. 204.

On October 8, 2003, Dr. Williamson submitted a medical source statement concerning Lajoie's ability to perform mental work-related activities. TR. 205-06. Dr. Williamson opined that Lajoie had slight limitations in the ability to understand, remember, and carry out detailed instructions. TR. 205. He noted that Lajoie "[w]ould have difficulty with written instructions as limited reading ability." *Id*.

On October 28, 2003, Lajoie presented to Dr. Breininger with complaints of wheezing. He was diagnosed with bronchitis and told to quit smoking. TR. 208.

---

[15] "A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness ." STEDMAN'S at 536.

On December 10, 2003, Lajoie was treated at an emergency room. TR. 222-36. A chest x-ray showed no clinically significant findings. TR. 232. The attending physician noted that Lajoie suffered from COPD, asthma, body aches, fever, cough, wheezing, and congestion. TR. 222. The impression at discharge was a viral syndrome with exacerbation of chronic lung disease. TR. 224.

On February 14, 2004, Lajoie was examined at Royal Oaks complaining of a productive cough with dizziness. The assessment was COPD. TR. 240.

On February 17, 2004, Dr. Kinsella prepared a medical source statement concerning Lajoie's ability to perform physical work-related activities. TR. 248-51. Dr. Kinsella opined that Lajoie could occasionally lift less than ten pounds. He could stand or walk (with normal breaks) less than two hours in an eight-hour workday. TR. 248. Dr. Kinsella opined that Lajoie's ability to sit was unaffected by his impairment. TR. 249. His ability to push and/or pull was limited in his upper extremities. TR. 249. Dr. Kinsella opined that Lajoie could never climb, balance, crouch or crawl. *Id*. He could only occasionally kneel, stoop, and reach in all directions including overhead. TR. 249-50. He could only have limited exposure to temperature extremes, dust, humidity/wetness and fumes, odors, chemicals and gases. TR. 251. Dr. Kinsella wrote that this assessment was based on the finding that Lajoie suffered from severe restrictive and obstructive pulmonary disease with less than 50% lung capacity. He further noted that Lajoie suffered from breathing problems and that he tired easily. TR. 249.

D. *Reviewing Professionals*.

On September 26, 2002, a physician whose name is illegible reviewed Lajoie's records and prepared a physical RFC assessment at the request of the SSA. TR. 124-31. This physician

-14-

opined that Lajoie could frequently lift twenty-five pounds and occasionally lift fifty pounds. He could stand or walk (with normal breaks) and sit about six hours in an eight-hour workday. TR. 125. His ability to push and/or pull was unlimited. Lajoie was to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and the like. TR. 128. This physician also noted that "PFT 09/02 test results appear normal." TR. 126.

On November 10, 2002, David Z. Kitay, M.D., reviewed Lajoie's records and prepared a physical RFC assessment at the request of the SSA. TR. 132-39. His assessment was that same as that of the earlier reviewing physician, except that Dr. Kitay did not include any environmental limitations on Lajoie's ability to work. TR. 136.

## IV.    STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standards. *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1986). While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision. *Id*. at 1000. Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The Court may not reweigh the evidence or substitute its own judgment for that of the SSA. *Id*. When reviewing a final

decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  The Act provides further that a claimant is not disabled if he is capable of performing his previous work or, if "considering his age, education, and work experience, [he could] engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).  Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI benefits.  In sum, when evaluating a claim for benefits under OASDI an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment or combination of impairments severe?

(3) Does the claimant's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?[16]

20 C.F.R. § 404.1520(a)(4).

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g., McDaniel*, 800 F.2d at 1030.

## V.   ANALYSIS.

Lajoie raises several interrelated issues on appeal. First, Lajoie argues that the ALJ erred by disregarding Dr. Kinsella's opinion when assessing his RFC. Next, Lajoie contends the ALJ erred by failing to order additional pulmonary function testing. Lajoie further maintains that the ALJ's hypothetical questions to the VE were incomplete. Finally, Lajoie asserts that the ALJ erred in finding that his testimony about the limitations arising from his impairments was not totally credible.

I begin with the ALJ's treatment of Dr. Kinsella's functional capacity assessment, because I find it to be dispositive. As previously discussed, Dr. Kinsella opined that Lajoie could occasionally lift less than ten pounds, stand or walk (with normal breaks) less than two hours in an eight-hour workday, never climb, balance, crouch or crawl, only occasionally kneel, stoop, and reach in all directions including overhead. In addition, Dr. Kinsella opined that Lajoie's ability to push and/or pull was limited in his upper extremities and that he could only tolerate limited

---

[16] In an OASDI case, a claimant must also establish that he was disabled during the time that he was insured under the act. *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

exposure to temperature extremes, dust, humidity/wetness and fumes, odors, chemicals and gases. TR. 248-51. The VE did not identify any jobs that a person with this RFC could perform.

The record reflects that Dr. Kinsella was one of the physicians at Royal Oaks who treated Lajoie over a significant period of time. As such, his opinion was entitled to great weight unless good cause not to do so is established. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).[17] The ALJ's stated reasons for giving little weight to Dr. Kinsella's assessment were that: (1) his assessment was difficult to read; (2) the spirometric pulmonary tests included with his assessment did not appear to be supported by three satisfactory forced expiratory maneuvers; and (3) no pulmonary function test report was submitted with the assessment. TR. 15. This reasoning is not supported by substantial evidence in the record.

Dr. Kinsella's assessment was written on a form, with checks in boxes corresponding to the limitations Dr. Kinsella found to exist. The only portion of the form that arguably is difficult to read are the handwritten medical/clinical findings supporting Dr. Kinsella's conclusion. Even in the photocopy of this assessment included in the record before the Court, however, the handwritten portion is legible. It reads as follows: "Pt. suffers from severe restrictive and obstructive pulmonary disease with less than 50% lung capacity. He gets out of breath and tires very easily." TR. 249.

---

[17] There are two copies of Dr. Kinsella's assessment in the record. TR. 237-39, 248-50. The ALJ incorrectly concluded that the first copy of the assessment was prepared by a medical consultant, which appears to be her terminology for a reviewing physician. TR. 14. Because the ALJ recognized that the second copy of the assessment was prepared by Dr. Kinsella, the error in the ALJ's conclusion about who prepared the first copy of the assessment is harmless.

While it is correct that a pulmonary function test report was not submitted with Dr. Kinsella's assessment, the records from Royal Oaks, where Dr. Kinsella practiced, include the results of "pre" and "post" bronchodilator tests that support Dr. Kinsella's written statement that Lajoie had less than 50% lung capacity.  The "pre" bronchodilator FVC result was 40% of the predicted value and the "post" bronchodilator FVC result was 45% of predicted values.  TR. 242-43.

Finally, the ALJ is correct that in order to be presumptively disabled as defined in section 3.00 of the Listed Impairments in the SSA regulations, the FVC and $FEV_1$ (one-second forced expiratory volume) values must be drawn from "at least three satisfactory forced expiratory maneuvers."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E.  However, neither the ALJ nor the Commissioner cites to any legal authority supporting that conclusion that the results from fewer than three tests are necessarily invalid for purposes of diagnosis and treatment by physicians.  Furthermore, and perhaps most importantly, while the SSA requested a spirometry test to be performed based on the procedures required in the regulations, there is no indication that the SSA required the results of the tests to be interpreted by the physician or other treating professional who administered the tests.  Thus, Dr. Kinsella's assessment is the only opinion by a treating professional of the functional limitations arising from Lajoie's COPD that the ALJ had in the record.  Under these circumstances, rejecting Dr. Kinsella's opinion because he relied upon results of a spirometry test that was comprised of two, rather than three, forced expiratory maneuvers does not constitute good cause to give little weight to Dr. Kinsella's functional capacity assessment.

Because the Commissioner has not properly weighed the functional capacity assessment of Dr. Kinsella, remand is required for further proceedings.

## VI.     CONCLUSION.

It is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings consistent with the foregoing analysis.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 22nd day of March, 2006.

Copies furnished to:

Counsel of Record
Unrepresented Parties